UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
SHERIF ELKADY,

              Petitioner,

       -against-

VICTOR HERBERT, Superintendent,
Attica Correctional Facility,

              Respondent.
-----------------------------------------------------X

**MEMORANDUM & ORDER**

03 CV 3575 (RJD)

DEARIE, Chief Judge.

      Petitioner, Sherif Elkady, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

For the reasons stated below, the application is denied, and the petition is dismissed.

### Background

      At around 3:00 a.m. on June 9, 1996, petitioner went to his estranged wife Iman Ahmed's

apartment in Astoria, Queens. During a heated argument, he stabbed his wife with a kitchen

knife over fifty times. He fled, leaving her alone there to bleed to death.

      Later that morning, petitioner contacted Ahmed Bayomi, a friend from the medical

school that he and Iman attended in Egypt, and took a train to Virginia where Bayomi lived. He

confessed to Bayomi and to Hassan Mahmoud Ebraheim, another medical school friend, that he

had killed his wife. Petitioner asked Bayomi for money to fly to Florida and then Egypt.

      Bayomi and Ebraheim called the police that evening, and petitioner was arrested at the

Miami International Airport the next day. At police headquarters, he was interviewed by

Detective Lily Gonzalez. Petitioner told Detective Gonzalez that he and Iman began fighting

that night because she had been out late and had not returned his calls. The fight escalated when

he accused her of behaving inappropriately as a Muslim woman. Petitioner explained that he had

seen her out at a night club and flirting with another man, and that he had found a love note in her purse. He confessed to repeatedly stabbing Iman while she screamed and struggled to get away.

Petitioner then drew a diagram of the location of the trash can outside the apartment where he discarded the knife and agreed to make a formal statement. In the statement, he admitted that Iman was sitting on the bed when she "started to talk bad . . . like she didn't respect nothing." (Tr. 876.) Petitioner grabbed a knife from the kitchen wall (there was no door separating the kitchen from the bedroom) and "hit" her with it. (Tr. 876-77.) He said that he stabbed Iman "[t]oo many times. I don't know how many times." (Tr. 878.) Before petitioner left the apartment, Iman managed to get up off the bed but fell on the floor. (Tr. 878.)

Petitioner was charged with both intentional and depraved indifference murder. He was offered a plea to manslaughter in the first degree, with a sentence of eleven to twenty-two years. At the plea proceeding, however, petitioner refused to admit that he stabbed Iman and would not repeat the details of the crime that he had given to the police. The allocution was not acceptable to the prosecutor, and the trial judge terminated the proceeding.

At petitioner's jury trial, Detective Gonzalez recounted her interview, including petitioner's confession, and read petitioner's formal statement into the record. Bayomi and Ebraheim also testified to petitioner's admissions. Other witnesses described petitioner's prior physical abuse of Iman.

Iman's autopsy showed "a total of fifty-eight injuries . . . . twenty-seven stab wounds, fourteen slash wounds, sixteen puncture wounds, and one bruise." (Tr. 948.) With respect to how and when the wounds were inflicted, the medical examiner testified that:

the presence of so little blood inside the body . . . given the severity of the stab
wounds in the internal organs, that would indicate to me that a lot of bleeding had
occurred before those were inflicted. So it is, I think, very likely or very probable
that many of the injuries on the arms and elsewhere that did not penetrate the
body had been inflicted before the deep wounds . . . .

(Tr. 958.) The ultimate cause of death was "multiple stab wounds to the torso with perforation

of the right lung and of the liver," (Tr. 964), and the estimated the time of death was between

3:00 a.m. and 5:00 a.m. (Tr. 961).

Defense counsel argued that the police investigation was bungled and that petitioner was

framed. The New York detective assigned to petitioner's case testified about the police's failure

to recover the knife from the location petitioner gave to the Miami authorities. In addition,

petitioner's employer and a longtime friend testified that Bayomi was indebted to petitioner.

Although Bayomi denied owing petitioner money, he admitted that he received a one thousand

dollar reward for his tip to the police.

Petitioner was acquitted of intentional murder but convicted of depraved indifference

murder. On June 8, 1998, he was sentenced to twenty-five years to life in prison. On direct

appeal, counsel for petitioner claimed that (1) the trial court improperly granted the prosecutor's

reverse-Batson motion and seated a juror over petitioner's peremptory challenge; (2) there was

insufficient evidence to support the depraved indifference murder conviction; and (3) petitioner's

right to consular notification under the Vienna Convention on Consular Relations ("Vienna

Convention") was violated. Petitioner raised several additional claims in a pro se supplemental

brief, including that his Miranda rights were violated and that the trial court improperly

terminated his plea proceeding and erroneously rejected his plea. On October 9, 2001, the

Appellate Division affirmed the conviction, holding:

3

the evidence established that, in a state of rage, believing that his wife had cheated on him with a non-Muslim man, the defendant recklessly stabbed and slashed her, and left her to bleed to death on the floor. Under these circumstances, the jury had a reasonable basis to conclude that the defendant acted with wanton indifference to life or a 'depravity of mind.'

People v. Elkady, 731 N.Y.S.2d 472, 473 (App. Div. 2001). The Appellate Division also rejected petitioner's claim that the trial court erroneously seated a juror over his peremptory challenge, finding adequate support for the trial court's determination that the defendant's proffered explanation for his peremptory challenge was pretextual. Id. In addition, the court found petitioner's Vienna Convention claim to be unpreserved and, in any case, without merit because he failed to demonstrate that he was prejudiced by the lack of consular notification. Id. Finally, the claims petitioner raised in his pro se supplemental brief were rejected as unpreserved or without merit. Id. Leave to appeal to the Court of Appeals was denied on December 28, 2001. People v. Elkady, 97 N.Y.2d 681 (2001). Petitioner moved pro se for reconsideration on Feburary 6, 2002, and leave was again denied on March 27, 2002. People v. Elkady, 97 N.Y.2d 753 (2002).

In the interim, on September 14, 2001, petitioner filed a pro se motion to vacate his conviction pursuant to New York Criminal Procedure Law§ 440, claiming trial counsel was ineffective for failing to investigate and call alibi witnesses. Petitioner's application was denied on November 1, 2001, and he did not seek leave to appeal.

On August 16, 2002, petitioner moved for a writ of error coram nobis, arguing that appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel claims based on the handling of petitioner's failed plea. Petitioner's motion was denied on November

4

18, 2002, People v. Elkady, 749 N.Y.S.2d 902 (App. Div. 2002), and his application for leave to appeal that decision was denied on February 26, 2003. People v. Elkady, 99 N.Y.2d 614 (2003).

In July 2003, petitioner filed the instant petition pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus, contending: (1) there was insufficient evidence to support his depraved indifference murder conviction because no rational juror could find that he acted recklessly rather than intentionally, (2) the trial court improperly seated two jurors over his peremptory challenges, (3) his confessions to the Miami police should have been suppressed because he did not knowingly and intelligently waive his Miranda rights, (4) trial counsel rendered ineffective assistance during the plea proceeding, (5) the trial judge violated his due process rights by arbitrarily terminating the plea proceeding, and (6) he was deprived of his right to consular notification under the Vienna Convention. In addition, petitioner challenged New York's depraved indifference murder statute as unconstitutionally vague. Before this Court ruled on the petition, by letter dated January 31, 2005, petitioner moved for a stay to allow him to further litigate his sufficiency claim in state court in light of the holding in People v. Payne, 3 N.Y.3d 266 (2004), that a one-on-one knifing almost never qualifies as depraved indifference murder.

While this action was stayed, in May of 2005, petitioner filed a motion to vacate on sufficiency grounds based on Payne. The court denied the motion, finding the sufficiency claim procedurally barred for having been raised and rejected on the merits on appeal. In addition, the court concluded that Payne "merely clarified the law of depraved indifference murder" and did not make a retroactive change such that the procedural bar did not apply. People v. Elkady, Ind. No. 2220/96, July 8, 2005. Petitioner did not appeal. Instead, several months later, he filed a motion to renew in light of People v. Suarez, 6 N.Y.3d 202 (2005), in which the Court of

5

Appeals held that "[a] defendant may be convicted of depraved indifference murder when but a single person is endangered in only a few rare circumstances." Id. at 212. The state court denied his motion, again finding his sufficiency claim procedurally barred. In addition, the court concluded that "the decision in Suarez d[id] not constitute a change in the law of depraved indifference murder, but rather Suarez codifie[d] existing case law" and that under Suarez "the defendant was properly convicted of depraved indifference murder based upon legally sufficient evidence." People v. Elkady, Ind. No. 2220/96, April 25, 2006.

The Court of Appeals of New York then decided People v. Feingold, 7 N.Y.3d 288 (2006), overruling People v. Register, 60 N.Y.2d 270 (1983) and People v. Sanchez, 98 N.Y.2d 373 (2002), under which "depraved indifference to human life" defined "the factual setting in which the risk creating conduct must occur," and holding, instead, that it "is a culpable mental state." Policano v. Herbert, 7 N.Y.3d 588, 597, 601 (2006). Petitioner filed a petition for writ of habeas corpus in state court on December 26, 2006, arguing that federal due process required application of Feingold, Suarez, and Payne to his case. On June 8, 2007, the petition was denied both on procedural grounds and because "pursuant to the express statement of the Court of Appeals in Policano, the case law upon which defendant relies does not apply retroactively." People ex rel. Elkady v. Conway, 838 N.Y.S.2d 308, 309 (App. Div. 2007) (internal citation omitted). Petitioner's motion for leave to appeal was denied on October 11, 2007. People ex rel. Elkady v. Conway, 844 N.Y.S.2d 785 (2007).

On October 30, 2007, petitioner moved to reinstate the instant petition. The claims petitioner raises that have been rejected in state court on the merits must be reviewed by this Court with deference, and relief cannot be granted unless the relevant state court decision was

6

either contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d) (1) (A writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."); see also Carey v. Musladin, 549 U.S. 70, 74 (2006) (habeas relief available only if state court decision "was contrary to or involved an unreasonable application of this Court's applicable holdings"); Lockyer v. Andrade, 538 U.S. 63, 75 (2003) ("[t]he 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous;" it must be "objectively unreasonable"). For the reasons set forth below, relief is denied.

## Discussion

I. Sufficiency of the Evidence

A habeas petitioner challenging sufficiency bears a "very heavy burden," Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (citing Quirama v. Michele, 983 F.2d 12, 14 (2d Cir. 1993)). The reviewing court must evaluate the evidence in the light most favorable to the prosecution and uphold the conviction "if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); a court "faced with a record of historical facts that supports conflicting inferences *must presume*—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and *must defer* to that resolution." Id. at 326 (emphasis added).

7

Under New York law, a person is guilty of depraved indifference murder when "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person," N.Y. Penal Law § 125.25(2), and "[a] person acts recklessly . . . when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur." N.Y. Penal Law § 15.05(3). Under People v. Register, 60 N.Y.2d 270 (1983), the controlling case at the time of petitioner's trial and conviction, "[u]nder circumstances evincing a depraved indifference to human life" defined "the factual setting in which the risk creating conduct must occur," and was not part the required culpable mental state of the crime of depraved indifference murder. Id. at 276-77.

Petitioner argues that the evidence demonstrated that his conduct could only have been intentional and that his conviction for a crime requiring recklessness, therefore, must be vacated. Further, he contends that post-conviction changes in the depraved indifference murder jurisprudence of the New York Court of Appeals must be applied and that those changes render his conviction invalid. Thus, to adjudicate petitioner's sufficiency claim, this Court must determine which definition of depraved indifference murder applies and whether, construing the evidence in the light most favorable to the prosecution, any rational juror could have concluded that petitioner acted with the mental culpability required under such definition.

II. Applicable Depraved Indifference Murder Law

Under the Register formulation, the culpable mental state required for depraved indifference murder was recklessness. Register, 60 N.Y.2d at 276. As reaffirmed in People v.

Sanchez, 98 N.Y.2d 373 (2002), decided in July of 2002 after petitioner's conviction became

final,

> Register requires a significantly heightened recklessness,
> distinguishing [depraved indifference murder] from manslaughter
> in two ways. First, "in a depraved mind murder the actor's conduct
> must present a grave risk of death whereas in manslaughter it
> presents the lesser substantial risk of death." Then, it also requires
> proof of circumstances manifesting a depraved indifference to
> human life, focusing the inquiry, as we have seen, "upon an
> objective assessment of the degree of risk" which "converts the
> substantial risk present in manslaughter into a very substantial
> risk"

Id. at 380 (quoting Register) (citations omitted; emphasis in original). New York depraved

indifference murder law "remained static" through the court's decision in Sanchez. Policano, 7

N.Y.3d at 595. As articulated by the New York Court of Appeals,

> Sanchez epitomized [the Court's] depraved indifference
> jurisprudence under the Register regime, the hallmarks of which—
> at least with respect to fatal one-on-one shootings or knifings—
> were twofold. First, even though such an attack by its very nature
> presents compelling circumstantial evidence of intent to cause
> death, we considered the question of the defendant's state of mind
> to be a classic matter for the jury. . . .
>
> Second, the factual setting in which the risk-creating
> conduct must occur, viewed objectively—Register's standard for
> determining whether there are circumstances evincing a depraved
> indifference to human life—was fulfilled if a defendant's actions
> created an almost certain risk of death by, for example, shooting
> the victim in the head multiple times at close range. As [the court]
> expressed this concept in Sanchez, where the defendant's actions
> created "a transcendent risk" of causing death, "the level of
> manifested depravity needed to establish [depraved indifference
> murder]" was "readily" met.

Policano, 7 N.Y.3d at 599-600 (quoting Sanchez, 98 N.Y.2d at 378). Although "it has never

been permissible in New York for a jury to convict a defendant of depraved indifference murder

9

'where the evidence produced at trial indicated that if the defendant committed the homicide at all, he committed it with the conscious objective of killing the victim,'" Policano, 7 N.Y.3d at 600 (citation omitted), under the Register formulation,

> [t]hat a defendant's acts virtually guaranteed the victim's death did not, in and of itself, preclude a guilty verdict on a theory of depraved indifference. To the contrary . . . the very facts establishing a risk of death approaching certainty and thus presenting compelling circumstantial evidence of intent—for example, a point-blank shooting of the victim in the head— likewise demonstrated depraved indifference.

Id. at 601. Further, "where both intentional and depraved indifference murder were charged in one-on-one shootings or knifings, these counts were submitted to the jury for it to sort out the defendant's state of mind unless there was absolutely no evidence whatsoever that the defendant might have acted unintentionally." Id. at 600-01 (emphasis added).

In Sanchez, the defendant and the victim, who were the boyfriends of two sisters, exchanged "harsh words" and then the defendant abruptly turned around and fired a gun at the victim's chest at close range from behind a partially opened door. Sanchez, 98 N.Y.2d at 375-76. The court upheld the conviction for depraved indifference murder on the ground that the jury reasonably could have found that the shooting was "sudden, spontaneous and not well-designed to cause imminent death," and may have "concluded that [it] was an instantaneous, impulsive shooting—perhaps to disable or frighten [the victim], rather than to kill him. Thus, a jury reasonably could have found that defendant's homicidal level of mental culpability was reckless rather than intentional." Id. at 377-78.

After the Sanchez decision, the interpretation of one of the elements of depraved indifference murder, "under circumstances evincing a depraved indifference to human life,"

10

"gradually and perceptibly changed from an objectively determined degree-of-risk standard (the Register formulation) to a mens rea." Id. at 602-03. As stated by the Court of Appeals, "[t]he purpose of [the] new interpretation of 'under circumstances evincing a depraved indifference to human life' [was] to dispel the confusion between intentional and depraved indifference murder, and thus cut off the continuing improper expansion of depraved indifference murder." Id. at 603. The changes began with People v. Hafeez, 100 N.Y.2d 253 (2003), decided on June 10, 2003, continued with People v. Gonzalez, 1 N.Y.3d 464 (2004), Payne and Suarez, and ended with Feingold. Policano 7 N.Y.3d at 603. Under current New York law,

> it is now clear that . . . "a one-on-one shooting or knifing (or similar killing) can almost never qualify as depraved indifference murder" (Payne, 3 N.Y.3d at 272); that "[a] defendant may be convicted of depraved indifference murder when but a single person is endangered in only a few rare circumstances" (Suarez, 6 N.Y.3d at 212); and that "'depraved indifference to human life' is a culpable mental state" (Feingold, 7 N.Y.3d at 296).

Policano at 601. The Court of Appeals acknowledged, however, that:

> [a]s the many concurring decisions and dissents in these cases and the dissent in this case illustrate, individual judges hold differing views as to where along this trajectory a majority of the Court may have effectively passed the point of no return—the limit beyond which, hard as we may have tried, it was simply not possible to reconcile our developing case law with Register and Sanchez.

Id. at 603. While the Court of Appeals left open the question of which case represented the "point of no return," it held that the post-Sanchez case law did not apply retroactively. Id. at 603-04; see also Flowers v. Fisher, 296 Fed.Appx. 208, 210 (2d Cir. 2008) ("We look to New York law as it existed at the time [petitioner's] conviction became final, as the New York Court of Appeals has found that although the law on depraved indifference has changed significantly in recent years, those changes do not apply retroactively.").

11

The Second Circuit recently addressed, as a question of first impression, "whether, or under what circumstances, due process requires that a new interpretation of a criminal statute by a state's highest court be applied retroactively on collateral review." Henry v. Ricks, 578 F.3d 134, 139-140 (2d Cir. 2009). Noting that in Policano, "the New York Court of Appeals applied its own precedent to determine whether its new interpretation of New York Penal Law § 125.25(2) applied retroactively and concluded that it did not," the Circuit held that the Due Process Clause does not require retroactive application of the new interpretation. Id. at 141. This Court must, therefore, apply New York law as it existed at the time petitioner's conviction became final in 2002. See 28 U.S.C. § 2244(d)(1)(A); Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001) (if no petition for certiorari filed, conviction becomes final 90 days after Court of Appeals denies leave to appeal). Thus, none of the post-Sanchez changes to depraved indifference murder law applies to this petition.

III. Merits of Petitioner's Sufficiency Claim

This case is not one in which there was "absolutely no evidence whatsoever that the [petitioner] might have acted unintentionally." Policano, 7 N.Y.3d at 601. Thus, under Register and Sanchez, the question of petitioner's state of mind was properly left to the jury. See, e.g., People v. Tankleff, 606 N.Y.S.2d 707, 711 (App. Div. 1993) ("The jury's conclusion that the defendant lacked a conscious objective to kill while he was beating [and stabbing] his mother to death is not irrational, and should be upheld.")

Viewing the evidence in the light most favorable to the prosecution, a rational juror could have concluded that petitioner acted recklessly under circumstances evincing depraved

indifference as interpreted under <u>Register</u> and <u>Sanchez</u>. Petitioner had a history of subjecting his wife to serious physical abuse, and at the time of the murder, the two were engaged in a very heated argument. Petitioner grabbed a kitchen knife that was within his reach and began stabbing her. A rational juror could have decided that petitioner's violent actions were sudden and impulsive and that petitioner did not intend to cause her death. The evidence that petitioner's rage was fueled by intense jealousy also supports the inference that he had an attachment to Iman that, while deeply unhealthy, precluded him from intending to kill her.

The medical examiner's testimony that *many* of the injuries that did not penetrate Iman's body likely were inflicted *before* the deep wounds in Iman's internal organs also supports the conclusion that petitioner did not intend to kill her, though his repeated attacks ultimately caused her to bleed to death. Under the applicable case law, although the jury could have found, given the nature of the one-on-one attack, that petitioner acted with intent, such finding was not the only possible rational conclusion; that petitioner "created 'a transcendent risk' of causing death" by stabbing Iman so many times satisfied the "level of manifested depravity needed" for a depraved indifference murder conviction. <u>Sanchez</u>, 98 N.Y.2d at 378.

Moreover, even applying post-<u>Sanchez</u> case law, petitioner's sufficiency claim fails. His violent attack on Iman comes within the category of "rare circumstances" in which depraved indifference murder can be found in an "unintentional killing[] involving only a single individual." <u>Suarez</u>, 6 N.Y.3d at 211. Specifically, those circumstances include

> when a defendant—acting with a conscious objective not to kill but to harm—engages in torture or a brutal, prolonged and ultimately fatal course of conduct against a particularly vulnerable victim. When a defendant's actions serve to intensify or prolong a victim's suffering, they bespeak a level of cruelty that establishes the depravity mandated by statute.

Id. at 212-13. Considering the medical examiner's testimony that Iman died sometime between 3:00 a.m. and 5:00 a.m. and petitioner's statement that she managed to move off of the bed before falling to the floor where he left her, a rational juror could have concluded that she suffered alone for hours before dying.

IV. Constitutionality of New York's Depraved Indifference Murder Statute

Petitioner challenges the constitutionality of New York's depraved indifference murder statute, arguing that there is no principled basis upon which to distinguish between depraved indifference murder and reckless manslaughter. Because petitioner has not previously raised this claim, it is unexhausted. See Jones v. Keane, 329 F.3d 290, 295 (2d Cir. 2003) (assertion of insufficiency claim on direct appeal "not substantially the same as [a] vagueness claim since the insufficiency claim does not alert the state court to a claim of statutory vagueness"). In any case, vagueness challenges to the depraved indifference murder statute have been rejected repeatedly by the New York Court of Appeals and district courts in this Circuit. See Gaskin v. Graham, No. 08-CV-1124 , 2009 WL 5214498, *15 (E.D.N.Y. December 30, 2009) (collecting cases). Accordingly, petitioner is not entitled to relief on this claim.

V. Petitioner's Peremptory Challenges

Petitioner contends that the trial court's seating of two jurors over his peremptory challenges violated his federal constitutional rights. However, the right to peremptory challenges is grounded purely in state law. Rivera v. Illinois, 129 S.Ct. 1446, 1450 (2009) (internal citations and quotation marks omitted) ("States may withhold peremptory challenges altogether without impairing the constitutional guarantee of an impartial jury and a fair trial."). Consequently, "the

14

mistaken denial of a state-provided peremptory challenge does not, without more, violate the

Federal Constitution." Id. at 1454 (internal citations and quotation marks omitted); see also

McKinney v. Artuz, 326 F.3d 87, 98 (2d Cir. 2003) (leaving open question whether improper

denial of defendant's peremptory challenge can be basis for habeas relief).

The trial court engaged in the three-step inquiry required under Batson v. Kentucky, 476

U.S. 79 (1986): (1) determining whether the party challenging the strike has made a prima facie

showing that it was racially motivated; (2) requiring the party exercising the strike to proffer a

race-neutral explanation; and (3) determining whether the party challenging the strike has carried

its burden of proving discrimination. Rice v. Collins, 546 U.S. 333, 338 (2006). At step two, the

explanation need not be "'persuasive, or even plausible;' so long as the reason is not inherently

discriminatory, it suffices." Id. (quoting Purkett v. Elem, 514 U.S. 765, 767-68 (1995)). At step

three, "the persuasiveness of the justification" is evaluated, but "the ultimate burden of

persuasion regarding racial motivation rests with, and never shifts from, the opponent of the

strike." Id. (quoting Purkett, 514 U.S. at 768).

During the third round of jury selection, after defense counsel exercised a peremptory

challenge against Ms. Gladys Davis, a Caucasian female, the prosecutor renewed the reverse-

Batson challenge she had unsuccessfully made twice before. At that point, the trial court

recognized a pattern of strikes by defendant against Caucasians, rejected defense counsel's

proffered explanation that Davis had given petitioner a "dirty look" as pretext, and seated Davis.

In so ruling, the trial judge noted that he did not see her "give anybody a dirty look, dirty look or

any kind of look." (Tr. 242.)

15

During the fifth round, defense counsel challenged another Caucasian female, Ms. Eileen Osonidsch. Ms. Osonidsch had referred to her youngest child, who was twenty-seven years old, as her "baby" and said that he was a policeman. In response to further questioning, she stated that the fact that her son was a policeman would not affect her evaluation of witness testimony. The prosecutor again made a reverse-Batson challenge. The trial judge rejected as pretextual defense counsel's explanation that Ms. Osonidsch had indicated favoritism toward the police by her statement that her "baby" was a police officer, and he seated Ms. Osonidsch. He observed that her reference to her son as her "baby" was meant to be humorous and noted that only the prosecutor, not defense counsel, questioned her.

As respondent points out, petitioner exhausted his claim regarding the seating of only Ms. Osonidsch; counsel explicitly did not challenge the seating of Ms. Davis on appeal. The Appellate Division rejected petitioner's claim with respect to Ms. Osonidsch on the merits, and its determination was neither contrary to nor an unreasonable application of Batson. Petitioner is not entitled to relief on either claim.

The determination at step three is a finding of fact that is accorded "great deference" and reviewed for clear error on direct appeal; "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." Hernandez v. New York, 500 U.S. 352, 364-65 (1991). The deference accorded "stems from the fact that the best evidence of the credibility *vel non* of a race-neutral explanation will often . . . be the demeanor of the attorney who exercises the challenge, and such evaluations of demeanor lie[ ] peculiarly within a trial judge's province." Messiah v. Duncan, 435 F.3d 186, 196 (2d Cir. 2006) (internal citations and quotation marks omitted). Moreover, when the race-neutral explanation given is in

turn based on the demeanor of the juror, the trial judge's 'first hand observations' are of great importance." Thaler v. Haynes, 130 S.Ct. 1171 (2010) (quoting Snyder v. Louisiana, 552 U.S. 472, 477 (2008)).

On collateral review, to grant relief based on a state court's determination at step three, "a federal habeas court must find the state-court conclusion to be 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Collins, 546 U.S. at 338 (quoting 28 U.S.C. § 2254(d)(2)). In addition, under 28 U.S.C. § 2254(e)(1), the determination is "presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. at 338-39. Petitioner has not met either standard.

With respect to Ms. Davis, at the third step of the Batson inquiry, the trial judge rejected defense counsel's proffered race-neutral reason for the challenge—that Ms. Davis had given counsel a dirty look—based on his own contrary observation, and there is no basis for disturbing his ruling. With respect to Ms. Osonidsch, he rejected defense counsel's proffered explanation also based on first-hand observation. This Court recognizes that a peremptory challenge based on a prospective juror's familial relationship to a law enforcement officer is on its face not pretextual. Had defense counsel simply based her peremptory strike on that relationship alone, she likely would have prevailed. Instead, however, counsel argued that Ms. Osonidsch's use of the word "baby" indicated favoritism toward the police. The judge dismissed Ms. Osonidsch's choice of words as not indicative of bias but merely an attempt to be funny, noting that there was laughter in the courtroom when she repeated her characterization of her son as her "baby." Moreover, the fact that defense counsel did not question her about anything, including her

objectivity, factored into the judge's assessment of the legitimacy of counsel's stated reason for her challenge. Given the constraints of the standards applicable on collateral review, petitioner is not entitled to relief. This Court cannot conclude that the trial judge's factual determination at step three was unreasonable, and petitioner has not demonstrated by clear and convincing evidence that such determination was incorrect.

## VI. Petitioner's Plea Proceeding

Petitioner challenges the effectiveness of trial counsel for failing to adequately assist him during his unsuccessful attempt to plead to manslaughter. He also claims that the trial judge arbitrarily terminated the plea proceeding, violating his due process rights. To the extent that petitioner's claim is based on New York Criminal Procedure Law § 220.10, which provides that "the defendant may as a matter of right enter a plea of 'guilty' to the entire indictment" and that a plea to a lesser included offense requires "the permission of the court and the consent of the people," it is not cognizable on habeas review. See 28 U.S.C. § 2254; Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Petitioner attempts to transform his claim into one of constitutional magnitude, however, by arguing that the judge's termination of the plea proceeding deprived him of his federal due process rights. His claim is utterly meritless. The record demonstrates that the judge's decision to terminate the proceeding was based on petitioner's repeated refusal to answer the prosecutor's questions and was not arbitrary. Although petitioner was willing to admit that he killed Iman, he was unwilling to admit that he stabbed her or to describe his actions in any detail, despite the

18

prosecutor's clear requirement that he give a full factual allocution. The trial judge was satisfied

with petitioner's admissions even though the prosecutor was not, explicitly stating "[n]ow there

is no plea because [the prosecutor] doesn't want the plea." (Pet. for Writ of Error Coram Nobis,

Ex. A, 12/11/97 Tr. 9.)

Petitioner's ineffective assistance of trial counsel claim also is clearly meritless. To

demonstrate constitutionally ineffective assistance, petitioner must show (1) that counsel's

performance "fell below an objective standard of reasonableness," Strickland v. Washington, 466

U.S. 668, 688 (1984), and (2) that petitioner was prejudiced by the deficient performance, id. at

692. To satisfy the prejudice prong, petitioner "must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." Id. at 694.

Counsel's conduct did not fall below an objective standard of reasonableness. He made

every effort to consummate the advantageous plea he had negotiated. The record reflects that

petitioner initially rejected the plea offer, but then defense counsel made an application to the

court to withdraw petitioner's not guilty plea. He stated: "[a]fter extensive plea negotiations

with the DA and . . . hours of consultation with Mr. Elkady, he has authorized me to enter a plea

of guilty in his behalf to . . . manslaughter in the first degree with the understanding that his

sentence will be 11 to 22." (Pet. for Writ of Error Coram Nobis, Ex. A, 12/11/97 Tr. 3.) During

the proceeding, however, petitioner twice stopped and asked to speak directly to the court. Each

time, counsel and petitioner had a discussion off the record, and petitioner continued with the

plea. Throughout, counsel repeatedly guided petitioner to answer the court's and the

prosecutor's questions. In addition, counsel successfully argued that petitioner's statement

during the plea colloquy that he "didn't mean to have her killed" was consistent with manslaughter and not grounds for the court to reject the plea. (Id. at 6.) He also attempted to justify to the prosecutor petitioner's reluctance to allocute to the the details of the crime, stating; "[h]e says that he feels uncomfortable to go over it again. He told the police." (Id. at 8-9.) Thus, the record belies petitioner's claim that he received inadequate assistance.

Moreover, petitioner cannot demonstrate prejudice because responsibility for the failed plea rests with him, not counsel. There is no reasonable probability that but for counsel's performance, the outcome of the plea proceeding would have been different. The record reflects that petitioner was uncooperative with more than one appointed lawyer regarding a plea. Indeed, at a subsequent pre-trial proceeding, where petitioner was represented by different counsel, the court offered him a sentence of fifteen years to life if he pled to the entire indictment, but petitioner declined. Counsel stated for the record that he had advised his client to plead in light of the strength of the case against him and that petitioner refused to take his advice. (April 8, 1998 Hearing, Tr. 12-14.)


V. Petitioner's Confession

Petitioner claims that his confessions to the Miami police should have been suppressed because he did not knowingly and intelligently waive his Miranda rights. He argues that his waivers were insufficient because (1) his understanding of the English language was limited and (2) next to each "yes" box on the warnings form, he wrote "I-S-S-U-E," a word that has no meaning in Arabic and does not correspond to "S-E," the first letters of his name. Petitioner's

pre-trial motion to suppress his statements was denied after a hearing. Both branches of petitioner's <u>Miranda</u> claim are meritless.

Voluntariness is determined by the "totality of the circumstances," <u>Arizona v.Fulminante</u>, 499 U.S. 279, 286 (1991), including "the entire course of police conduct with respect to the suspect," <u>Oregon v. Elstad</u>, 470 U.S. 298, 318 (1985). As part of the totality of the circumstances, the conditions of interrogation and the "relevant characteristics of the individual who confessed" must be considered. <u>Green v. Scully</u>, 850 F.2d 894, 901-02 (2d Cir. 1988).

There is no support in the record for petitioner's claim that he did not understand English well enough to effectively waive his <u>Miranda</u> rights. Petitioner is a mature, educated adult who had lived in this country for two years at the time of his arrest. At the pre-trial suppression hearing and at trial, Detective Gonzalez testified that upon first confronting petitioner at the Miami International Airport, she asked him a series of pedigree questions in English to which he responded in English. After each warning, Detective Gonzalez confirmed in English that petitioner understood the warning, and he responded in English. He was asked in English to sign the bottom of the form, and he did. Moreover, petitioner's formal statement was taken in English. As part of the question and answer, he was asked whether he could speak and read English and whether he understood "the way that [the detective was] talking." (Tr. 870) He answered "Yeah" to each question. (<u>Id.</u>) Petitioner reviewed the statement in English and corrected several English words.

During the course of making the formal statement, petitioner re-read the <u>Miranda</u> warnings form aloud in English and acknowledged that the notations next to each "yes" were his initials. He used the same series of letters— "I," "S," "S," "U," and "E"—to initial each

21

correction he made upon his review of the statement and at the bottom of each page. Thus, it is clear that by writing "I-S-S-U-E," petitioner was initialing to indicate his understanding and consent.

Petitioner also contends that his statements should have been suppressed because he was not provided with access to Egyptian consular officials as required by the Vienna Convention. The Supreme Court has clarified that, assuming without deciding that that the Vienna Convention creates judicially enforceable rights, states may apply the procedural default rules that generally apply to other federal-law claims, and suppression is not the required remedy for a violation. Sanchez-LLamas v. Oregon, 548 U.S. 331, 350, 360 (2006). Accordingly, even if petitioner could overcome his procedural default of this claim, he would not be entitled to relief.

### Conclusion

Petitioner's application for a writ of habeas corpus is denied, and the petition is dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. In addition, this Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
     May 25, 2010

                                   s/ Judge Raymond J. Dearie

                                 RAYMOND J. DEARIE
                                 United States District Judge